# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 07-60969-CIV-DIMITROULEAS/ROSENBAUM

MARK J. BISCHOFF,

      Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

                                    /

## REPORT AND RECOMMENDATION

### *I.  INTRODUCTION*

This matter is before the Court on the cross-motions for summary judgment filed, respectively, by Plaintiff Mark J. Bischoff ("Claimant") and by Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner").  Pursuant to 28 U.S.C. §636 and Magistrate Rules 1(c) and (d), Local Rules of the United States District Court for the Southern District of Florida, the Honorable William P. Dimitrouleas referred the motions. [D.E. 4, 6].

The cross-motions present the following issue: whether substantial evidence exists to support the determination by the Administrative Law Judge ("ALJ") that Claimant is not disabled under the Social Security Act and retains the residual functional capacity to engage in sedentary work.  Under the limited standard of review that governs this case, I conclude that substantial evidence exists and, consequently, recommend that the Court deny Plaintiff's Motion for Summary Judgment [D.E. 10] and grant Defendant's Motion for Summary Judgment [D.E. 16].

## II. *PROCEDURAL HISTORY*

Claimant filed an application for disability insurance benefits on March 15, 2002, under Title II of the Social Security Act ("Act"), 42 U.S.C. §§401, *et seq.* Administrative Record ("Tr."), 14. In his application, Claimant alleged that he had been disabled since July 1, 2001, as a result of "herniated disc L5-S1 w/pain and reduced r.o.m.; neurogenic bladder; depression." Tr. 132. Through September, 2003, Claimant met the insured status requirements of the Act and was fully insured, although after that time, Claimant failed to qualify. Tr. 14, 16.

The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. Tr. 84, 90. Thereafter, on January 22, 2003, Claimant requested and was granted a hearing before an ALJ. Tr. 93, 97. On November 30, 2004, ALJ Robert B. Rae held a hearing on Claimant's application. Tr. 14. In a decision dated January 18, 2005, Judge Rae denied Claimant's application, finding that he was not under a "disability," as defined in the Act. Tr. 81.

Claimant then requested review of the ALJ's unfavorable decision by the Appeals Council. Tr. 108. On August 19, 2005, the Appeals Council remanded the case to ALJ Rae for further proceedings, including a new hearing. Tr. 111.

Pursuant to the Appeals Council's order, Judge Rae held a second hearing on Claimant's application on October 10, 2006. Tr. 14. During this hearing, Claimant and Howard S. Feldman, a vocational expert, testified. *See* Tr. 744, 762. On December 26, 2006, Judge Rae again concluded that Claimant was not under a "disability," as defined under the Act, and, thus, denied Claimant's application for disability insurance benefits. Tr. 24.

Claimant sought review of the ALJ's unfavorable decision. Tr. 14. This time, however, the Appeals Council declined Claimant's request in a notice dated May 11, 2007, allowing the ALJ's

decision to stand as the final decision of the Commissioner.  Tr. 7.

On July 10, 2007, Claimant filed the Complaint in this case [D.E. 1] seeking reversal of the Commissioner's final decision.  The Commissioner filed his Answer on September 17, 2007. [D.E. 7].  Thereafter, on November 3, 2007, Claimant filed his Motion for Summary Judgment.  [D.E. 10] In that Motion, Claimant alleged three errors on the part of the Commissioner:

1. the Commissioner's finding that Claimant did not meet or medically equal Listing 12.05C, 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, §12.05;

2. the Commissioner's alleged improper minimization of the impact of Claimant's alleged neurogenic bladder on his functioning and the Commissioner's alleged failure to consider adequately the effect on Claimant's ability to function of this condition in combination with Claimant's other impairments; and

3. the Commissioner's alleged failure to articulate good cause for discrediting the opinions of Dr. Kass and Dr. Sassoon, Claimant's treating physicians.

D.E. 11 at 1.

On January 31, 2008, the Commissioner filed his Motion for Summary Judgment and responded to Claimant's motion, arguing that no error occurred.  [D.E. 16].  Claimant filed his Response to Defendant's Motion for Summary Judgment [D.E. 17] on February 14, 2008.  This case is now ripe for consideration.

### III. FACTS

#### A.   General Background

Claimant was born on April 7, 1963, and was 38 years old on July 1, 2001, the time of the onset of his claimed disability, and 40 years old on the date last insured (September 30, 2003).  Tr. 132.  Although Claimant was not working at the time of application or thereafter, he has past relevant work experience as a parts manager and as an automobile mechanic.  Tr. 16, 23.  The level

of Claimant's education is not entirely clear.  At various times, Claimant has described himself as

having completed only the sixth grade [Tr. 22], the seventh grade [Tr. 468], the eighth grade [Tr.

324], the ninth grade [Tr. 44], the tenth grade [Tr. 292], a general equivalency diploma [Tr. 22], and

vocational school for mechanics and automobile repair [Tr. 22, 44].

According to Claimant, he has been unable to work as a result of various ailments.  More

specifically, he alleges that he initially was injured in a motor vehicle accident in 1989.  Tr. 17.  A

second motor vehicle accident occurred six months later.  *Id.*  As a result of the first car accident,

Claimant had a catheter for two years.  *Id.*  He also experienced back and related problems, allegedly

resulting in a reduced range of motion, and he developed neurogenic bladder.  *Id.*  Additionally,

Claimant asserts that he suffers from depression.  Tr. 132.

Prior to applying for disability insurance benefits on March 15, 2002, Claimant previously

applied for disability insurance benefits.  Of relevance to the instant application, Claimant applied

on November 29, 1990, alleging disability since August 4, 1989, due to low back pain and urinary

incontinence arising out of the vehicle accidents previously discussed.  Tr. 43.  Following a hearing,

the ALJ determined that Claimant did not suffer from a "disability."  Tr. 51-52.

Claimant also applied on May 21, 1996, for disability insurance benefits, alleging an onset

date of December 31, 1994.  Tr. 55.  In the December 31, 1994, application, Claimant alleged a

disability stemming from his spinal condition with related loss of bladder control and reactive

depression, again arising initially out of the car accidents referred to above.  *Id.*  In a decision issued

on April 24, 1997, without the benefit of a hearing, a senior attorney advisor found that Claimant

suffered from severe impairments, including lumbar strain syndrome, degenerative bulging L4-5

with sciatica into the legs, especially on the left, neurogenic/hypotonic bladder with progressive

incontinence, and reactive depression with anxiety traits.  Tr. 62.  The senior attorney advisor further determined that these impairments resulted in a "disability" under the Act, and, consequently, disability benefits were awarded to Claimant. Tr. 63.   These benefits were terminated in 2001.  D.E. 11, p. 13; *see also* Tr. 292 (Report of examination by Dr. Coelho referring to reason for examination as Claimant's having been referred by the Office of Disability Determinations).

### B.     *Medical Evidence*

Although the medical records in this case cover a period of time extending well beyond September 30, 2003, and prior to July 1, 2001, I will consider the pre-July 1, 2001, records and the post-September 30, 2003, records only to the extent that they shed light on whether Claimant suffered from a "disability" as of September 30, 2003, the date last insured.  *See* 20 C.F.R. §404.320; *see Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981).[1]   Under the law, if a claimant becomes disabled after he has lost insured status, his claim for disability benefits must be denied, despite his disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).  Because Claimant raises three issues in his Motion for Summary Judgment, for ease of reference, the Court considers the medical evidence relating to each issue, noting that a combination of alleged impairments can cause a "disability," even when its component parts by themselves do not.

### 1.     Evidence Relating to Claimant's Neurogenic Bladder

As indicated above, in a 1997 determination, an ALJ found that Claimant had a severe impairment resulting from "neurogenic/hypotonic bladder with progressive incontinence."  Tr. 62.

_____

[1]Pursuant to *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

Benefits were terminated, however, in 2001.  D.E. 11, p. 13.

During the relevant time period, from July 1, 2001, when Claimant alleged the onset of his disability, through September 30, 2003, when Claimant's insured status expired, the medical records relating to the condition of Claimant's bladder consist of statements made in the (1) records of Eddie Sassoon, M.D., Claimant's treating physician who addressed Claimant's back-related problems; (2) report from the consultative examination performed by Susan Diaz, D.O. [Tr. 323]; and (3) report from the consultative examination made by Roland D. Kaplan, D.O. [Tr. 458].

With regard to Dr. Sassoon's records, these records reflect that Claimant visited Dr. Sassoon approximately seventeen times during the relevant time period, with the first visit occurring on February 27, 2002 [Tr. 261], and the last on September 2, 2003[2] [Tr. 368].  With respect to complaints regarding urologic symptoms, on April 25, 2002, Dr. Sassoon noted that Claimant "has frequent problems with [urinary] frequency."  Tr. 260.  He further indicated that Claimant was seeing Dr. K[ah]n for urologic management and Detrol.  *Id.*  Similarly, on June 7, 2002, Dr. Sassoon catalogued Claimant's complaints, stating that Claimant "has . . . urinary urgency," among other problems.  Tr. 259.

The following month, on July 15, 2002, however, Susan F. Diaz, D.O., conducted a consultative examination of Claimant, during which she noted that Claimant "states that he now has

---

[2]In addition to the medical records from Claimant's individual visits, Dr. Sassoon prepared three Medical Assessments of Ability to Do Work-Related Activities [Tr. 379, 522, and 705] and a letter addressed "to whom it may concern."  These documents, however, do not specifically refer to any urologic problems.  Consequently, although the Court will consider them as an evaluation of Claimant's medical condition in its entirety, including any role that any urologic problems may play in his condition, the statements contained in these documents will not be set forth in this section.  Rather, they will be noted in the following section, as they pertain to Claimant's back conditions.

bladder control . . . ." Tr. 323.  Consistent with Dr. Diaz's report, four days later, on July 19, 2002,

Dr. Sassoon noted that Claimant "has . . . had a history of urinary urgency which recently has

improved with questionable urologic dysfunction for which he follows with a urologist."  In Dr.

Sassoon's notes from the three appointments after Claimant's July visit, Dr. Sassoon made no

mention of any urologic difficulties of which Claimant was complaining at that time.  *See* Tr. 256,

257, 378.  On November 27, 2002, Dr. Sassoon wrote that Claimant "developed neurogenic bladder

which eventually improved.  He was under the care of a urologist for several years."  Tr. 377.  In the

next three appointments between December 23, 2002, and February 19, 2003, Dr. Sassoon again

made no statements in his notes that Claimant complained of urologic symptoms.  *See* Tr. 374, 375,

376.  On April 17, 2003, Dr. Sassoon noted that Claimant "has also had urinary urgency and

neurologic problems with neurogenic bladder as result [sic] of work[-]related injuries for which he

falls under the care of urology."  Tr. 373.

Dr. Sassoon next mentioned Claimant's urologic symptoms in his notes from Claimant's May

29, 2003, visit, stating, "He is to see Dr. Kahn of urology for his bladder urgency condition which

he has had as a result of his injury.  He has been maintained on Ditropan for this purpose and will

undergo reevaluation in one month."  Tr. 372.  Following Claimant's July 1, 2003, visit to Dr.

Sassoon, Dr. Sassoon noted, "He continues to see Dr. Kahn on a prn basis for urinary urgency."  Tr.

371.  Dr. Sassoon made no further mention of any urologic problems Claimant may have been

experiencing during Claimant's visits to Dr. Sassoon within the period Claimant was last insured.

*See* Tr. 368, 369, 370.  The Administrative Record contains no documents from Dr. Kahn.

Approximately six weeks after the period in which Claimant was last insured, on November

11, 2003, Dr. Sassoon stated in his notes that Claimant "developed a neurogenic bladder which

eventually did improve with urologic intervention. . . .  At this time, he is not complaining of any incontinence."  Tr. 367.  Also following the period in which Claimant was last insured, on December 19, 2005, Roland D. Kaplan, D.O., conducted a consultative examination of Claimant.  At that time, Claimant complained of "some ongoing pain with urination," although Claimant indicated that he had "no recent history of loss of bowel or bladder control."  Tr. 458.

### 2.    Evidence Relating to Claimant's Back-Related Problems

The medical records within the applicable timeframe, which pertain to Claimant's back-related problems fall into five categories:  (1) records of Eddie Sassoon, M.D., Claimant's treating physician, including three Medical Assessments of Ability to Do Work-Related Activities; (2) records of Joel Fleiss, M.D., a treating physician of Claimant's; (3) report from the consultative examination performed by Susan Diaz, D.O. [Tr. 323]; (4) report from the consultative examination made by Roland D. Kaplan, D.O. [Tr. 458]; and (5) Physical Residual Functional Capacity Assessments prepared by Jennifer Peckoo-Williams, M.D, and another DDS physician.  [Tr. 327, 335].

Considering these records chronologically, Dr. Fleiss first saw Claimant during the relevant time frame.  On October 8, 2001, Claimant complained to Dr. Fleiss of skin sensitivity and burning that increased while he was "working out" or "sweating."  Tr. 289.  Dr. Fleiss prescribed hydrocortisone.  A few months later, on January 28, 2002, Claimant visited Dr. Fleiss and explained that he had been "working [at] home building [a] fence" when he experienced lower back pain.  Tr. 284.

The following month, on February 27, 2002, Claimant saw Dr. Sassoon.[3]  Dr. Sassoon noted that Claimant had a chronic lumbar radicular condition and that he complained that "prolonged standing, sitting, bending or twisting activities aggravat[ed] his discomfort[,]" although Claimant reported performing home exercises and stretches.  Tr. 261.  According to Dr. Sassoon, Claimant's back condition originated as a result of a car accident that occurred in 1989.  Although Dr. Sassoon observed that Claimant had a decreased range of motion throughout the lumbar spine and that Claimant walked with an antalgic gait, he noted that Claimant had been taking Vicodin ES and Flexeril for pain and spasms and that the combination had "worked well for him."  *Id.* Consequently, Dr. Sassoon renewed Claimant's prescriptions for these drugs.

Over the next several months during the insured period, Claimant visited Dr. Sassoon a total of an additional sixteen times.  In his treatment notes during this time, Dr. Sassoon noted that Claimant experienced decreased range of motion, had significant tenderness upon rotation of the hips, and had multiple trigger points in his mid and lower lumbar paraspinal muscles.  Tr. 256. Additionally, Dr. Sassoon indicated that Claimant suffered from chronic sacroiliitis[4] (Tr. 367),

---

[3]Approximately two years elapsed from the last time Claimant had visited Dr. Sassoon, on February 15, 2000, to his February 27, 2002, appointment.  *See* Tr. 261.

[4]Sacroiliitis is an inflammation of one or both of the sacroiliac joints, which connect the lower spine and pelvis.  www.mayoclinic.com.

lumbar disc disease,[5] and lumbar radiculitis.[6]  Tr. 373.

Dr. Sassoon variously prescribed home exercises, stretches, a physical therapeutic program, acupressure, TENS[7] therapy, magnet therapy, Lidocaine injections, a Lidoderm patch, Flexeril, Celebrex, Zoloft, Percocet, Vicodin, Neurontin, Pamelor, and Skelaxin.  Tr. 257-60; 367-78. According to Dr. Sassoon's treatment notes, Claimant found these treatments to be helpful and to provide "significant relief."  *See, e.g.,* Tr. 257,-59, 367-73.  Claimant, himself, reported to Dr. Sassoon that the medications decreased his pain level from a nine to a two or three out of ten and enabled Claimant to perform basic activities of daily life and to stay independent.  Tr. 368, 369, 371, 373; *see also* 376 (stating that medication decreased pain to four out of ten and enabled him to function), 377 (same).  Claimant similarly advised Dr. Sassoon that Lidocaine injections were helpful and provided him with relief for three to four weeks at a time.  Tr. 370, 371, 374, 376, 377, 378.

In addition to treating Claimant, on May 28, 2004, March 17, 2006, and August 21, 2006, Dr. Sassoon prepared Medical Assessments of Ability to Do Work-Related Activities.  [Tr. 379, Tr. 522, Tr. 705].  In each of these Medical Assessments, Dr. Sassoon concluded that Claimant could

---

[5]Lumbar disc disease, also referred to as a herniated disc, occurs in the lumbar area of the spine when a disc compresses and creates a bulging disc.  When a bulging disc ruptures, the fragments of disc material can press on the nerve roots located just behind the disc space. Approximately 12 million Americans suffer from lumbar disc disease. http://www.ohsu.edu/health/health-topics/topic.cfm?id=8838.

[6]Radiculitis is pain radiating from a nerve path because of pressure on the nerve root where it connects to the spine.  When the pain occurs in the lower or lumbar area, it is often called "sciatica."  www.spinaldisorders.com.

[7]"TENS" is the acronym for transcutaneous electrical nerve stimulation.  A TENS unit is a small, battery-operated device that sends electrical impulses to certain parts of the body to block pain signals.  http://arthritis.about.com/od/assistive devicesgadgets/g/tensunit.htm.

engage in neither light nor sedentary work.

Two consultative examinations were also performed on Claimant. The first was done by Susan Diaz, D.O., on July 15, 2002. Tr. 323. In examining Claimant's lower lumbar spine, Dr. Diaz found it to be "mild[ly] inflam[ed]." Tr. 325. Additionally, she noted "mild-to-moderate tenderness to palpation and upon range of motion with limited range of motion." *Id.* While she determined that the straight leg-raising test was positive on the left to approximately 30 degrees, she, nonetheless, noted that "[a]ll other joint groups and ranges of motion [were] within normal limits." *Id.* Dr. Diaz further reported Claimant's gait to be "normal," although she noted that Claimant could not walk on heels and toes or perform a partial squat. *Id.* Based on her examination, Dr. Diaz concluded, as it pertained to Claimant's back, that Claimant had low back pain, secondary to his motor vehicle accident. Tr. 326.

Roland D. Kaplan, D.O., performed a second consultative examination on December 19, 2005. Tr. 458. Dr. Kaplan found that Claimant walked with a slight limp favoring the left lower extremity, but he was able to heel-and-toe walk. Tr. 459. Additionally, Dr. Kaplan specifically observed "a good range of motion in hips, knees, and in ankles." *Id.* He found that Claimant's muscle strength was grossly 5-/5 and that Claimant had "full range of motion in his shoulders, elbows, wrists, and fingers." *Id.* According to Dr. Kaplan's examination, Claimant's cervical spine range of motion was grossly intact, as were Claimant's lumbar spine flexion and extension and lateral flexion. *Id.*

Dr. Kaplan also reported on test results. With respect to x-rays of the lumbar spine, Dr. Kaplan found that they demonstrated "normal AP and lateral views with no evidence of fracture or dislocation." Tr. 459. Based on Claimant's "somewhat unstable gait," and not because of

Claimant's strength, Dr. Kaplan opined that Claimant was limited to carrying ten pounds. *Id.* He further determined that standing was limited to at least two hours in an eight-hour work day, but that Claimant was not restricted in any type of seated or light-duty type of activity. *Id.* Specifically, Dr. Kaplan reported that Claimant had "full use of his upper extremities with no limitations there." *Id.* In fact, Dr. Kaplan concluded that Claimant "would be a good candidate for vocational rehabilitation." *Id.*

As for the two Physical Residual Capacity Assessments in the record, on July 31, 2002, R. Jennifer Peckoo-Williams, M.D., concluded that Claimant could both stand and/or walk (with normal breaks) and sit (with normal breaks) for a total of about six hours in an eight-hour work day for each activity. Tr. 327. In a second Physical Residual Functional Capacity Assessment prepared on December 12, 2002, by a different DDS physician, the doctor reached the same conclusions as Dr. Peckoo-Williams with regard to Claimant's ability to sit and stand during a work day. *See* Tr. 336.

### 3. Evidence Relating to IQ, Factors Allegedly Bearing on the Validity of Claimant's IQ Test Results, and Claimant's Mental Health

On July 14, 2002, Angela C. Register, Ph. D., conducted a consultative examination of Claimant. Tr. 305. She concluded that Claimant suffered from affective disorders, but declined to check "mental retardation" as a category upon which her medical disposition was based. *Id.* In her functional capacity assessment, Dr. Register stated that although Claimant was depressed and had some impairment of concentration that would limit performance of detailed and complex tasks, Claimant's decreased attention and concentration were "not severe, and would not limit performance of simple work tasks." Tr. 321.

Claimant underwent another consultative psychiatric examination on January 7, 2003. Tr. 343. This time, David L. Kirk, licensed psychologist, performed the evaluation. *Id.* As with Dr. Register, Dr. Kirk determined that Claimant had affective disorders, but he did not check "mental retardation" as a category upon which his medical disposition was based. *Id.* More specifically, Dr. Kirk wrote that Claimant suffered from the medically determinable impairment of mild to moderate depression. Tr. 346. In the Mental Residual Functional Capacity Assessment that Dr. Kirk prepared, he concluded that Claimant was not significantly limited with respect to most mental activities inquired about and that he experienced only moderate limitations with respect to a few categories of mental activities. Tr. 357-58.

On January 3, 2006, Claimant had a consultative examination performed by Kari Freedland Coelho, Psy. D. Tr. 468. Previously, on April 23, 2001, Dr. Coelho had performed another consultative examination on Claimant. Tr. 468, 292. Based on that examination, Dr. Coelho indicated the following diagnostic impression: dysthymic disorder and pain disorder associated with both psychological factors and a general medical condition (relating to Claimant's back problems).

During the 2006 evaluation, Dr. Coelho opined that Claimant "appeared to be a fair historian as the results from the current examination or at least some of the demographic information from the current evaluation differ[ed] from the information on the first mental status examination." Tr. 468. More specifically, Dr. Coelho noted that while Claimant had advised Dr. Coelho in the 2001 examination that he had completed the tenth grade, during the 2006 evaluation, Claimant said that he dropped out of school in the seventh grade. *Id.*

Also during the 2006 evaluation, Dr. Coelho asked Claimant about his pain. Tr. 469. Claimant responded that his pain was "at the top of the rating scale all of the time." *Id.*

-13-

As another part of the 2006 examination, Dr. Coelho administered the Wechsler Adult Intelligence Scale – Third Edition IQ test, as well as the Minnesota Multiphasic Personality Inventory – 2. Tr. 470. While Claimant took these tests, Dr. Coelho observed that he appeared to be "rather uncomfortable in the examination chair and shifted frequently." Tr. 469. Claimant, however, explained his discomfort, stating that he had not taken his pain medication. *Id.* Shortly after Claimant took the medication, Dr. Coelho found Claimant to be "in less distress and discomfort," and Claimant was able to complete the testing as necessary. *Id.* Dr. Coelho opined that Claimant demonstrated poor attention and concentration, and he took "an inordinate amount of time" to complete the MMPI, attributing Claimant's problems to his back pain and his "preoccup[ation] with his back pain." *Id.*

With respect to the MMPI, Dr. Coelho concluded that "[t]here was a strong indication that the profile [was] invalid due to extreme item endorsement." She further commented, "There is the possibility that [Claimant's] low intellectual functioning and difficulty contributed to test invalidity." Tr. 470. As for the IQ test, Claimant obtained a verbal scale IQ of 66 and a performance scale IQ of 63. *Id.* Because the difference between the verbal and performance scale results was "not significant," Dr. Coelho found that Claimant's full-scale IQ score of 62 "probably accurately represent[ed] his true current level of functioning." *Id.* Dr. Coelho arrived at the following diagnostic impressions as a result of the 2006 examination: "extremely low level of intellectual functioning[,] pain disorder associated with both psychological factors and a general medical condition[,] dysthymic disorder[,] and thought disorder, not otherwise specified." *Id.*

With regard to Claimant's treating physicians, during the relevant time frame, Claimant regularly saw Ethan Kass, D.O., to address his mental health issues. More specifically, Claimant

visited Dr. Kass in 2002 on June 13, July 22, September 23, and December 27.  In 2003 during the insured time period, Claimant saw Dr. Kass on January 31, March 28, May 30, July 30, August 25, and September 29.  Tr. 295-299; 397-402.  During this time period, Claimant reported variously that he had feelings of depression, anxiety, irritability, helplessness and hopelessness, mood swings, racing thoughts, decreased motivation, decreased concentration, and decreased frustration tolerance. At his January and March, 2003, appointments, Claimant indicated that he was experiencing slight hallucinations and magical thinking.  On September 29, 2003, Claimant stated that he was "anxious about getting back disability money."  Tr. 397.

Despite Claimant's statements, in evaluating Claimant's mental status at his regular appointments, Dr. Kass always described Claimant's cognitive functioning as falling within normal limits and never checked boxes indicating that Claimant was disoriented as to time, place, or person; had recent memory deficit; remote memory deficit; concentration impairment; or attention problems. Tr. 295-299; 397-402.  Similarly, Dr. Kass always found Claimant to be "calm," although he evaluated Claimant's affect at different times as "full range," "dull," "anxious," and "blunt." *Id.* In his treatment notes from March 28, May 30, and July 30, 2003, Dr. Kass diagnosed Claimant as suffering from chronic schizophrenia, although on July 30, 2003, Dr. Kass concluded that Claimant's condition in this regard was "fairly stable."  Tr. 399-401.  During the course of Dr. Kass's treatment of Claimant over the relevant time period, Dr. Kass prescribed Zyprexa, Ambien, Xanax, Klonopin, and Valium for Claimant.  Tr. 295-299; 397-402.

After the insured period, on May 13, 2004, Dr. Kass performed a Medical Assessment of Ability to Do Work-Related Activities (Mental) of Claimant. Tr. 386-388. The Medical Assessment instructed Dr. Kass to rate Claimant's abilities in various regards on a scale including unlimited/very

good, good, fair, poor or none.  Tr. 386.  Additionally, for each activity for which Dr. Kass was required to rate Claimant's abilities, the Medical Assessment instructed him to "[i]dentify the particular medical or clinical findings (*i.e.*, mental status examination, behavior, intelligence test results, symptoms) which support your assessment of any limitations.  IT IS IMPORTANT THAT YOU RELATE PARTICULAR MEDICAL FINDINGS TO ANY ASSESSED LIMITATION IN CAPACITY; THE USEFULNESS OF YOUR ASSESSMENT DEPENDS ON THE EXTENT TO WHICH YOU DO THIS."  *Id.* (emphasis in original).  Dr. Kass checked "poor or none" for most abilities and "fair" for the remaining abilities and added only, "Patient suffers from chronic and recurrent psychotic and depressive symptoms that adversely affect sleep, concentration, mood modulation, and social interactions.  Patient has been diagnosed as suffering from a major mood disorder and schizophrenia.  Most likely diagnosis is schizoaffective disorder.  Progress is guarded to poor."  Dr. Kass did not refer to any tests or examinations he might have performed to support such a finding.

On August 31, 2006, Dr. Kass prepared a second Medical Assessment of Ability to Do Work-Related Activities (Mental) regarding Claimant.  Tr. 710-713.  Again, he rated Claimant's abilities in various areas as "poor or none," for the most part, and "fair" for the rest.  *Id.*  This time Dr. Kass made the following comments.  With respect to Claimant's ability to make occupational adjustments, Dr. Kass wrote that Claimant had "high anxiety, mood lability, and racing thoughts which interfere with abilities to work [with] others."  Tr. 710.  As for Claimant's ability to make performance adjustments, Dr. Kass commented that Claimant had "psychomotor restlessness, tangential and circumstantial thought processes" and that he had "memory and concentration problems on MSE [mental status examination.]"  Tr. 711.  In assessing Claimant's ability to make personal social

-16-

adjustments, Dr. Kass noted that Claimant was "restless [with] mood lability" and that Claimant became "very anxious and depressed[;] unpredictability." *Id.* With regard to Claimant's ability to engage in other work-related activities, Dr. Kass indicated that Claimant presented with an "irritable/anxious affect, psychomotor restlessness, tangential and circumstantial thought processes, decreased concentration, fair memory" and that Claimant had a combination of "depressed and anxious mood and racing thoughts." Tr. 712. Finally, Dr. Kass found that Claimant suffered from his impairment at the level indicated by Dr. Kass in that Medical Assessment "since at least 1996." *Id.*

Although Dr. Sassoon served as Claimant's physician and handled matters pertaining to his physical health, as opposed to his mental health, Dr. Sassoon occasionally commented on Claimant's mental health as well. On February 27, September 11, and October 30, 2002, and on February 19, 2003, Dr. Sassoon opined in his treatment notes that Claimant was alert, oriented, and pleasant. Tr. 256, 261, 374, 378. Similarly, on August 14, 2003, Dr. Sassoon stated that Claimant was experiencing no side effects such as GI upset or cognitive dysfunction as a result of his medications. Tr. 369.

### C.     *The Hearing Before the ALJ*

The ALJ held an administrative hearing in this matter on October 10, 2006. *See* Tr. 735-783. At the time of the hearing, the ALJ asked Claimant's attorney whether Claimant had any objections to any of the documents in the record, to which Claimant's counsel replied, "No objections. It's complete." Tr. 739.

Next, the ALJ explained that the Appeals Council wanted him to give further consideration to Dr. Sassoon's treating source opinion. Tr. 739. In response to this instruction from the Appeals

Council, the ALJ stated that he had given further consideration to Dr. Sassoon's treating source opinion "through a letter" and that he had received additional information from Dr. Sassoon. *Id.* at 739-40.  The ALJ further noted the other direction he had received from the Appeals Council and then turned to Claimant's counsel and asked, "[I]s there anything additional that you'd like to add at this time or from your client or otherwise?"

Claimant's counsel answered by directing the Court to Dr. Coelho's January 3, 2006, consultative evaluation of Claimant, as well as indicating that Claimant had voluntarily committed himself for approximately 36 hours under the Baker Act. Tr. 740-41; *see also* Tr. 756 (Claimant's testimony regarding this incident).  Claimant's counsel further indicated generally that Claimant has both some psychological problems and some physical ailments.  Tr. 741.  Thereafter, the Court noted that at the last hearing, Dr. Griscom, who performed a mental evaluation on Claimant, found that Claimant did not meet or equal any listing and that indications existed that Claimant's medical condition was improved by medication.  Tr. 744.  Additionally, the ALJ stated, "There's indication that [Claimant] drives, had a[n] ongoing relationship with a girlfriend, helps put fences in, works out in the gym, it looks like [s]hops, stands jury duty, worked at least part time while disabled, and at the beach, *et cetera*, things like that." *Id.*

Claimant was then sworn, and he testified.  The ALJ began by asking Claimant to explain "what ha[d] changed since [their] last hearing together, which was in December of '04." Tr. 744. Claimant responded that he was taking stronger medications such as MS Contin, which he did not previously take, for lower back pain. *Id.*

Next, the ALJ asked Claimant to explain what he did on a daily basis.  Tr. 745.  Claimant explained that the new medication was much stronger, and, as a result, Claimant needed "a lot more

rest" and his reactions were slower.  Tr. 746.

Claimant further testified that as a result of Hurricane Wilma,  his moods were " a lot worse now than what they were a year ago."  Tr. 746-47.  According to Claimant, Hurricane Wilma destroyed Claimant's house, and Claimant was no longer with his girlfriend.  Tr. 746.  Claimant explained that he really did not have any "friends . . . to speak of . . . because of [his disabilities. Nobody really wants to get around me.  I don't even hardly get along with my brother. . . ." Tr. 747. He elaborated that he was not calm at the time of the hearing because he was "under a severe amount of stress" from his house "being destroyed, not having money to be able to see [his] doctor and get [his] medications[,] . . . [ant that he was] virtually one step away from being homeless." Tr. 748. To maintain compliance with his medications, Claimant stated that he borrowed money from his mother. *Id.*

When testifying to his daily activities, Claimant said that he went to his mother's house, drove "from time to time," and saw his girlfriend "every once in a while."  Tr. 749.  In describing his ability to drive, Claimant stated that the farthest he had driven since 2004 was "maybe 50 miles at the most."  Tr. 755.  Additionally, Claimant said that he sometimes drove to the mall and "tr[ied] to walk around as much as" he could.  Tr. 751.  According to Claimant, he stayed at the mall "maybe a couple of hours at the most."  *Id.*; Tr. 753.  While there, he "walk[ed] for maybe five minutes" and then sat down.  Tr. 757.  When the ALJ asked Claimant whether he had any problems with sitting, Claimant stated that he did not take his medication before the hearing, which he was supposed to take at 9:00, [8] because he wished to be "as coherent" as he could, and, as a result, he was "in a lot of pain" during his testimony.  Tr. 751.  As for other activities, Claimant stated that he had a next-

_____

[8]According to the transcript, the hearing began at 10:42 a.m.  Tr. 737.

door neighbor whom he spoke to "for maybe 15 or 20 minutes from time to time," and that he slept a couple of hours during the day.  Tr. 753, 757.

The ALJ also asked Claimant about his refusal in the past of surgery for the herniated disc in his back.  Tr. 749.  In response, Claimant explained that he was "afraid [surgery would] worsen [his] condition because of [his] neurogenic bladder and everything else."  *Id.*  Claimant continued, "[Anesthesia] messes up my bladder because I have a neurogenic bladder."  *Id.*

When the ALJ discussed treatment by Dr. Sassoon of Claimant's back pain, Claimant admitted that the medications Dr. Sassoon had prescribed helped with the low back pain, as did ice, use of a TENS unit, and low-impact aerobics and stretching.  Tr. 749, 751.  Without his medication, Claimant testified, he "can barely even exist."  Tr. 752.  Claimant testified that he took morphine, Percocet, and Oxycodone, although Claimant's doctor did not limit driving.  Tr. 759.  The ALJ noted that Claimant did not use a cane or other assistive device, and Claimant agreed.  Tr. 754.

In response to the ALJ's question regarding Claimant's ability to work, Claimant answered that he did not believe he could perform any work anymore, as he knew only how to fix cars.  Tr. 753.  More specifically, Claimant suggested that he could not work at a job where he sat at a monitor to watch for a security breach because he "require[d] rest during the day."  Tr. 754.

Following Claimant's testimony, the ALJ examined Dr. Howard Feldman, a vocational expert.  Tr. 762.  When the ALJ asked Dr. Feldman to assume a hypothetical individual of Claimant's age, education and experience who could perform sedentary, simple work, Dr. Feldman opined that such an individual could work as a ticket taker, gate guard, and surveillance monitor. *See* Tr. 768.

D.    *The ALJ's Decision*

The ALJ rendered his decision on December 26, 2006.  [Tr. 11].  In short, the ALJ determined that Claimant did not have a disability as defined under the Social Security Act and was not entitled to disability benefits.  More specifically, the ALJ found that Claimant's allegations of total disability were inconsistent with and disproportionate to the medical evidence in the record, as well as being inconsistent with his work experience and lifestyle, and that Claimant was not credible in material respects.  Tr. 16-23.  Thus, the ALJ concluded that through the date Claimant was last insured, although Claimant could not perform past relevant work, he had the ability to perform sedentary work that existed in significant numbers in the national economy.  Tr. 23-24.

## IV.  STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, a court's role is a limited one. *Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983).  The Commissioner's findings of fact must be affirmed if they are supported by "substantial evidence.*" Id.*; *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d. 842 (1971).  "Substantial evidence" is more than a scintilla of evidence but less than a preponderance and is such relevant evidence that a reasonable person might accept as adequate to support the challenged conclusion.  *Id.* at 401, 91 S.Ct. at 1427; *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir. 1982).  The court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Bloodsworth*, 703 F.2d at 1239.  The scope of review is limited to an examination of the record only.  *Reynolds v. Secretary of HHS*, 707 F.2d 927 (6th Cir. 1983).  If the ALJ's decision is supported by substantial evidence, the reviewing court must affirm the decision.  *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).  In addition to determining whether

the Commissioner's factual findings are supported by substantial evidence, the court must determine whether the ALJ properly applied the correct legal standards. *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

## V.   ANALYSIS

### A.   The Sequential Evaluation and Its Application by the ALJ

Initially, a claimant has the burden of establishing that he is disabled under the Social Security Act. *Walden*, 672 F.2d at 838; *Hargis v. Sullivan,* 945 F.2d 1482, 1489 (10th Cir. 1991). A "disability" is defined as an inability . . .

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  In determining the merits of a claim for benefits, the court must consider the evidence as a whole, including: 1) objective medical facts or clinical findings; 2) diagnoses of examining physicians; 3) subjective evidence of pain and disability as testified to by the claimant and corroborated by other witnesses; and 4) the claimant's age, education, and work history. *Walden*, 672 F.2d at 839.

*Step One.*   To arrive at a determination as to disability, the ALJ must undertake the five-step sequential evaluation embodied in 20 C.F.R. § 404.1520.  This process requires that the ALJ first determine whether the claimant is presently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  If so, a finding of "no disability" is made.  If the claimant is not engaged in such activity, then the ALJ must proceed to the second step of the sequential evaluation.

As a threshold matter, the ALJ determined that Claimant met the disability insured status

requirements of the Social Security Act on July 1, 2001, the alleged onset date, and was insured for

disability benefits through September 30, 2003. Tr. 16. The ALJ then applied the facts, as he found

them, to the sequential evaluation framework. At Step One, he found that Claimant did not engage

in substantial gainful activity from the date of onset through his date last insured. *Id.*

*Step Two.* At the second step, the ALJ must determine whether the claimant suffers from

a "severe impairment" or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). An

impairment is severe if it significantly limits the claimant's physical or mental ability to perform

basic work activities. 20 C.F.R. § 404.1520(c). If the ALJ concludes that none of the claimant's

impairments are medically severe, the ALJ will consequently find that the claimant is not disabled;

if, however, the ALJ concludes that the claimant's impairments are medically severe, then the ALJ

will proceed to the next phase of the analysis. *Id.* Here, the ALJ found that Claimant suffered from

the severe combination of impairments caused by degenerative disc disease and depression. Tr. 17.

Claimant takes issue with the ALJ's decision not to recognize his neurogenic bladder and

related urinary problems as an impairment to be considered in combination with other impairments.

*Step Three.* The third step requires the ALJ to consider the "medical severity of [the

claimant's] impairments" in order to determine whether the claimant's impairment meets or equals

those listed in Appendix I of the Regulations. 20 C.F.R. § 404.1520(d). Although the list is too

voluminous to set forth here, the listings help to identify those claimants whose medical impairments

are so severe that it is likely that they would be found disabled regardless of their vocational

background. *Bowen v. Yuckert*, 482 U.S. 137, 153, 107 S. Ct. 2287, 2297 (1987). If the ALJ

concludes that the impairments meet or equal one of those listed and meet the duration requirement,

the ALJ will find the claimant disabled without considering age, education, and work experience.

-23-

20 C.F.R. § 404.1520(a)(4)(iii) & (d).  If not, the inquiry will proceed to the next stage.

In this case, the ALJ determined that Claimant did not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Part 404, Subpart B, Appendix 1.  Tr. 17.  Accordingly, to find Claimant disabled, the ALJ needed to proceed to the next step in the analysis.  As noted above, Claimant objects to the ALJ's analysis at this point in that Claimant complains that the ALJ failed to take into account the effect of Claimant's neurogenic bladder and related urinary issues on the severity of his impairment.  Additionally, Claimant argues that the ALJ improperly concluded that Claimant's IQ did not fall below 70, and, thus, Claimant urges, the ALJ wrongly failed to find that Claimant met the requirements of any listing entitling him to a finding of disability.

*Step Four.*  This step requires that the ALJ determine whether the claimant has the "residual functional capacity" to perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The Regulations define "residual functional capacity" ("RFC") as what an individual can still do despite any limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a).  This determination takes into account "all relevant evidence," including the medical evidence, the claimant's own testimony, and the observations of others.  *Id.*  The ALJ must then compare the RFC to the demands of the previous employment to determine whether the claimant is still capable of performing that kind of work.  If so, the ALJ will conclude that the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv) & (f).

Here, the ALJ assessed Claimant's residual functional capacity.  Tr. 21-23.  In making that assessment, the ALJ considered Claimant's subjective complaints, but he found that those complaints were "sadly lacking in credibility. . . ."  Tr. 22.  The ALJ determined that Claimant's

allegations of the degree of disability were not consistent with Claimant's own description of his activities and life style, nor his behavior at the hearing. *Id.* Moreover, the ALJ found Claimant's allegations concerning his alleged mental disability to be inconsistent with Claimant's mental capacity as demonstrated by his past work experience. *Id.* The ALJ further concluded that Claimant's allegations concerning the degree of disability were disproportionate to the medical evidence in the record. Tr. 22-23. The ALJ also carefully considered all of the medical opinions in the record regarding the severity of Claimant's impairments and found that the opinions of the treating physicians were unsupported by any rationale, that no clinical support for the treating physicians' opinions existed, and that the treating physicians' opinions were inconsistent with their own treatment notes. Tr. 23. Hence, the ALJ relied upon the opinions of the State Agency, which the ALJ found to be supported by the evidence in the record. *Id.*

Nevertheless, based upon his review of the entire record, including treating physician records, opinions of state agency medical consultants, the medical evidence, and Claimant's testimony and conduct, the ALJ found that Claimant did not have the residual functional capacity to perform his past relevant work as an automobile mechanic or parts manager as of the date last insured. Tr. 23.

*Step Five.* If, as in this case, the claimant establishes an inability to return to past relevant work, the burden shifts to the Commissioner to demonstrate that there exists other substantial gainful employment in the national economy that the claimant can perform. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *Smith v. Schweiker*, 646 F.2d 1075, 1077 (5th Cir. 1981). If the Commissioner proffers possible alternative employment, the burden returns to the claimant to prove an inability to perform those jobs. *Id.* These shifting burdens comprise the fifth and final step, at which point the ALJ must resolve whether the claimant is actually capable of performing other

gainful and substantial work within the economy.  20 C.F.R. § 404.1520(f).  Essentially, the ALJ must determine if there is other work available in significant numbers in the national economy that the claimant has the ability to perform.  If the claimant can make the adjustment to other work, the ALJ will determine that the claimant is not disabled.  If the claimant cannot make the adjustment to other work, the ALJ will determine that the claimant is disabled.

In this case, based on the ALJ's review of the entire record, as explained above, the ALJ determined that Claimant had, through the date last insured, the residual functional capacity to perform relevant work and found that Claimant could in an eight-hour day, sit up to six hours, stand or walk up to two hours.  Tr. 21.  Additionally, the ALJ concluded that Claimant was able to perform simple, routine, repetitive tasks that require only occasional climbing.  Tr. 21.  The ALJ then relied on a vocational expert, who provided testimony that an individual with these abilities could perform work that existed in the national economy in significant numbers as of the date last insured.  Tr. 23-24.  Thus, the ALJ concluded that Claimant was not under a "disability," as defined in the Social Security Act, as of the date last insured.  Tr. 23-24.  Claimant challenges the ALJ's conclusions with regard to Step Five, contending that the ALJ improperly discounted the opinions of Claimant's treating physicians, Dr. Sassoon and Dr. Kass.

### B. *The ALJ's Decision Is Supported by Substantial Evidence*

As discussed above, Claimant alleges three separate errors in the ALJ's decision: (1) the ALJ failed to consider the impact of his neurogenic bladder and related urinary problems in combination with Claimant's other impairments in determining the medical severity of Claimant's impairments and considering whether this combination of impairments met or equaled a disability listing; (2) the ALJ improperly concluded that Claimant's IQ exceeded 70, and, thus, incorrectly determined that

Claimant did not meet any disability listing; and (3) the ALJ wrongly discounted the opinions of Claimant's treating physicians in assessing Claimant's residual functional capacity to perform any work in the economy.  The Court considers each objection in turn.

### 1.   *Neurogenic Bladder and Related Urinary Problems*

Claimant asserts that the ALJ

> improperly assumed that [Claimant's] urinary functioning had improved during the relevant time period and therefore failed to engage in a detailed analysis of the condition.  In fact, although [Claimant] admits that eventually his symptoms improved to some extent, his condition has <u>not</u> improved to the extent of not impacting his functioning <u>prior to the expiration of his insured status</u>.

D.E. 11 at 12.  He further complains that "the records reflect that [Claimant] was under the care of a urologist – Dr. Khan – during the period in question.  Dr. Khan's records are not even included in the record in this case even though they are extremely relevant to this issue." *Id.* at 13.

Based on Claimant's objections, the Court begins by considering what the ALJ said with respect to the neurogenic bladder issue.  First, the ALJ stated generally with respect to what he took into account in reaching his decision, that he "carefully considered all the documents identified in the record as exhibits, the testimony at the hearing and all arguments presented."  Tr. 14.  More specifically, in assessing whether Claimant had an impairment or combination of impairments that met or medically equaled one of the listed impairments, the CLJ noted,

> Dr. Sassoon reported a treatment history of injections and nerve blocks, one of which resulted in a neurogenic bladder.  The claimant was able to urinate [on] his own but had pain with urination and problems with frequency.  This condition eventually improved.

Tr. 17.  Later in that same discussion, the ALJ reported that during Claimant's consultative examination with Roland D. Kaplan, D.O., Claimant "gave a history of low back pain and

neurogenic bladder." *Id.* at 18.  The ALJ also stated in his decision that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ."  Tr. 21.  Thus, a review of the record demonstrates that the ALJ did consider Claimant's complaints of neurogenic bladder and urinary frequency in determining whether Claimant suffered from an impairment or combination of impairments that met or medically equaled one of the listed impairments, and he took into account all evidence in the record relating to Claimant's neurogenic bladder and related urinary symptoms.

As for the ALJ's factual discussion of Claimant's bladder problems, the Court finds the ALJ's statements to be supported by substantial evidence.  First, on July 15, 2002, Susan F. Diaz, D.O., noted during her consultative examination of Claimant that Claimant "states that he now has bladder control. . . ."  Tr. 323.  More than four months later, on November 27, 2002, in Dr. Sassoon's treatment notes for Claimant, Dr. Sassoon wrote that Claimant "developed neurogenic bladder which eventually improved.  He was under the care of a urologist for several years."  Tr. 377.

Although some of Dr. Sassoon's later treatment notes for Claimant again refer to Claimant's urologic problems, they suggest that under his urologist's care and with the aid of medication, Claimant has been successful in controlling his urologic symptoms.  *See* Tr. 371, 372.  Further, the absence of any reference whatsoever to Claimant's bladder and urinary problems in Dr. Sassoon's notes from the three visits on July 25, 2003, August 14, 2003, and September 2, 2003, which fell within the insured period following Dr. Sassoon's July 1, 2003, reference to Claimant's visits to his urologist on an as-needed basis, indicates that the neurogenic bladder and related urinary problems no longer bothered Claimant at the time that Claimant's insured status ended.  This conclusion is further bolstered by the fact that during Claimant's next visit to Dr. Sassoon after the three where

-28-

Dr. Sassoon did not discuss any urologic issues, on November 11, 2003, Dr. Sassoon stated in his notes that Claimant "developed a neurogenic bladder which eventually did improve with urologic intervention. . . .  At this time, he is not complaining of any incontinence." Tr. 367.  While this visit occurred after the date last insured, the Court considers it in the sequence of Claimant's visits to Dr. Sassoon from July 25, 2003, and culminating on November 11, 2003.  Of course, September 30, 2003, the date last insured, falls within the time period from July 25, 2003, through November 11, 2003.  Thus, the evidence substantially supports a finding that Claimant was not functionally impaired as a result of his neurogenic bladder or related conditions as of September 30, 2003.

Moreover, on December 19, 2005, when Roland D. Kaplan, D.O., conducted a consultative examination of Claimant, Claimant indicated that he had "no recent history of loss of bowel or bladder control." Tr. 458.  Under these circumstances, the Court finds that the ALJ's discussion of and conclusions regarding Claimant's neurogenic bladder and related urinary problems was supported by substantial evidence, and the ALJ did not err in his accordance of minimal, or even no weight, to Claimant's neurogenic bladder and related urinary symptoms as of September 30, 2003, in his analysis of whether Claimant suffered from any combination of impairments that met or equaled any listing.[9]

_____

[9]To the extent that Claimant's brief can be interpreted to suggest that the ALJ should have obtained Claimant's medical records from his urologist Dr. Kahn, the Court must similarly reject this contention.  While the ALJ has a basic duty to develop a full and fair record, the claimant bears the burden of proving that he is disabled, and he is responsible for producing evidence in support of his claim. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) (citing 20 C.F.R. Pt. 416.912(a), (c)).  Here, Claimant neither produced Dr. Kahn's records nor requested that the Commissioner obtain them, although he clearly must have known about them, as Dr. Kahn was one of Claimant's treating physicians.  It is further noteworthy that in the ALJ's first decision issued in this matter, on January 18, 2005, he made the exact same statement about Dr. Sassoon's discussion of Claimant's bladder and urinary problems as he did in the decision at issue before the Court presently.  Yet Claimant did not seek to submit additional evidence regarding the

## 2.   *IQ Determination*

Claimant argues that as of the date last insured, the ALJ incorrectly found that Claimant did not satisfy the requirements in Section C of Listing 12.05C, 20 C.F.R. Pt. 404, Subpt. P, App. 1. D.E. 11 at 8.  Listing 12.05 is the listing category for mental retardation.  The introductory paragraph of Listing 12.05 reads, in relevant part, "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."  To satisfy this listing, a claimant must meet the requirements of sections A, B, C, or D of the listing.  As is relevant to the instant matter, Section C requires a claimant to demonstrate "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.05C.

In the case under review, Kari Freedland Coelho, Psy. D., administered a Wechsler Adult Intelligence Scale – Third Edition test to Claimant as part of her consultative examination on January 3, 2006.  Tr. 470.  The test results showed a verbal IQ of 66, a performance IQ of 62, and a full-scale IQ of 62.  *Id.*  Based on the differential between verbal and performance IQ, Dr. Coelho opined that Claimant's full-scale IQ score of 62 "probably accurately represent[ed] his true current level of functioning."  *Id.*  Other than this statement, which, on its face, expresses at least some reservation

bladder and urinary issues, even though he had a new hearing on October 10, 2006.  Indeed, to the contrary, at the hearing, Claimant's counsel opined that the record was "complete," and the ALJ even asked Claimant's attorney, "[I]s there anything additional that you'd like to add at this time or from your client or otherwise?"  Claimant submitted no new evidence regarding his bladder and urinary problems as of the date last insured, nor did he object that the record was deficient in this regard.  Under these circumstances, Claimant cannot now fairly be heard to complain that the ALJ erred by not obtaining and considering Dr. Kahn's records.

-30-

about the validity of the IQ test scores, Dr. Coelho made no specific determination regarding the validity of the IQ test scores.

The ALJ did not find the IQ score to be valid and instead determined that Claimant "was faking." Tr. 21. He based this conclusion on Claimant's prior work as a parts manager and an automobile mechanic, both of which are skilled jobs. *Id.* Additionally, the ALJ noted that Claimant was able to perform activities of daily living independently, such as showering, shaving, cooking, grocery shopping, doing laundry, using a dishwasher, and cleaning his home, and that he drove. Tr. 19-21. The ALJ further relied upon his determination that Claimant had lied repeatedly about how many years of school he had completed and other matters. *Id.* Moreover, the ALJ noted, Claimant had successfully finished automobile mechanic training. *Id.* Finally, the ALJ pointed to Dr. Coelho's finding that there was a "strong indication" that Claimant's profile as determined by a different examination administered during the same evaluation where Dr. Coelho administered the IQ test, the Minnesota Multiphasic Personality Inventory-2 ("MMPI"), was invalid due to "extreme item endorsement." *Id.*

Claimant argues that the ALJ should not have found the IQ score to be invalid. In support of this contention, Claimant states that he was a special education student in school and suggests that Dr. Coelho's assessment of Claimant as a "fair historian"[10] explains his apparent difficulty in recalling precisely how much school he attended. *See* D.E. at 9. Additionally, Claimant urges that Dr. Coelho was "fully aware of all the confusion as to [Claimant's] grade level completion and also his MMPI scores . . . and still concluded that [Claimant's] IQ scores were valid and probably

_____

[10]Claimant actually employs the phrase "fair to poor historian." D.E. 11 at 9. Dr. Coelho's actual report of her January 3, 2006, evaluation, however, indicates that Claimant "appeared to be a fair historian . . . ." Tr. 468.

represented his true current level of functioning." *Id.* Claimant further notes that Dr. Coelho hypothesized that Claimant may have engaged in extreme item endorsement on the MMPI because of his "low intellectual functioning and difficulty comprehending test items." *Id.* In other efforts to explain the invalidity of the MMPI results, Claimant asserts that the ALJ should have considered whether a diagnosis of schizophrenia by Dr. Kass might have had an effect on Claimant's ability to complete the MMPI testing. *Id.* at 10. More specifically, Claimant notes that Dr. Coelho stated that Claimant required more time to take the MMPI because he was taking frequent breaks to walk around in response to his complaints of pain. In short, Claimant argues that Dr. Coelho determined the IQ score to be valid, and she took into account "the entire picture." *Id.*

Finally, Claimant refers to the DSM-IV-TR to support his contention that the ALJ misplaced his reliance on Claimant's prior work experience and his ability to engage in the activities of daily living when he found Claimant to be faking an IQ of 62. In this regard, Claimant notes that the DSM-IV-TR states with respect to individuals with an IQ in the range of 50-55 to approximately 70, "During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings." *Id* at 11 (quoting DSM-IV-TR at 43). Based on all of these considerations, Claimant contends that the ALJ erred in not finding the IQ score to be valid.

In the Eleventh Circuit, even "'a valid IQ score need not be conclusive of mental retardation where the IQ score is inconsistent with other evidence in the record on the claimant's daily activities and behavior.'" *Thomas v. Barnhart*, 2004 WL 3366150, *2 (11th Cir. Dec. 7, 2004) (quoting

*Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992)).  Indeed, an ALJ is "not required to find that [a Claimant is] mentally retarded based on the results of the IQ test.  The ALJ is required to examine the results in conjunction with other medical evidence and the claimant's daily activities and behavior."  *Popp v. Heckler*, 779 F.2d 1497, 1500 (11th Cir. 1986).

In this case, the ALJ engaged in precisely this examination and found the IQ score not to be valid, nor Claimant to be mentally retarded.  The Court finds no error in the ALJ's determination.  Rather, substantial evidence in the record supports the ALJ's conclusion.  First, the ALJ justified his decision with the reasoning repeated above.  *See supra* at 31.  Further expounding on that analysis as it pertains to Claimant's former employment, the Court notes that Claimant himself described his responsibilities as a parts manager as requiring the use of machines, tools, or equipment, as well as the use of technical knowledge or skills.  Tr. 150.   Additionally, Claimant indicated that he supervised other people in this position and that he worked in this position, apparently successfully, for approximately five years.  Tr. 166.

The ALJ also explained that he found Claimant not to be credible and capable of "faking" for Dr. Coelho's benefit.  As the ALJ heard testimony from Claimant on two separate occasions in this case, he is in the best position to evaluate Claimant's credibility, and findings in this regard should be upheld if they are supported by good reasons and substantial evidence.  *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996); *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

Here, the Court finds both.  In support of the ALJ's conclusion that Claimant was "faking," the ALJ pointed specifically to Claimant's conflicting reports of his educational level.  Tr. 22.  As the record reflects and Claimant does not deny, at various times, he has stated that he finished only the sixth grade, only the seventh grade, only the eighth grade, only the ninth grade, and only the tenth

-33-

grade of school, that he obtained his general equivalency diploma, and that he attended vocational school for six months for mechanics and automotive repair.  Tr. 22.  Additionally, the ALJ relies on the previously stated reasons for determining that Claimant lacked credibility.

Other aspects of the record further suggest that Claimant is not credible.  Among other notable examples,[11] during his January 3, 2006, consultative examination with Dr. Coelho, Claimant reported that his pain was "at the top of the rating scale all of the time."  Tr. 469.  Yet the record reflects that during the period last insured, Claimant repeatedly advised his treating doctor, Dr. Sassoon, that Lidocaine injections provided relief for three to four weeks at a time and that other treatments such as drugs, exercise, stretching, ice, and heat, also significantly relieved his pain, taking it from a nine to a two or three on a scale of ten.  *See, e.g.*, Tr. 368, 369, 370, 371, 372, 374, 375.  Thus, Claimant's insistence to Dr. Coelho that he never experienced any relief from his pain was clearly false and appears to have been designed to attempt to manipulate the outcome of Dr. Coelho's evaluation of Claimant – a conclusion that suggests not only that Claimant also may have tried to manipulate the outcome of his MMPI and IQ tests, but also that Claimant had the mental acuity to concoct and execute such a scheme.

Moreover, the ALJ stated in his decision that he took into account all documents identified in the record as exhibits, the testimony at the hearing, and all arguments presented in rendering his decision.  In considering Claimant's IQ score in light of the entire record, the Court notes that in the absence of evidence of sudden trauma that can cause retardation, a presumption exists that IQ's remain fairly constant throughout life.  *Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001) (citing *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001)).  Here, there is no indication that Claimant

---

[11]Additional examples of Claimant's inconsistencies are noted in Section V.B.2, *infra*.

experienced sudden trauma resulting in recent brain injury.  Accordingly, it is noteworthy that neither the 1992 nor the 1997 decisions on Claimant's Social Security disability applications, which constitute exhibits in the record, even considered the possibility that Claimant could be mildly mentally retarded, apparently because Claimant did not raise it, and none of the other evidence tended to indicate it.  *See, generally*, Tr. 43-53; Tr. 55-64.  Indeed, the OHA Psychiatric Review Technique Form in support of the 1997 decision expressly notes the absence of mental retardation. Tr. 65.

Additionally, a review of the notes of Claimant's treating physicians similarly demonstrates a conspicuous absence of any indication that Claimant is mentally retarded.  Neither Dr. Sassoon nor Dr. Kass made any statements in their notes suggesting that Claimant is mentally retarded, although each of them saw Claimant regularly and repeatedly during the relevant time period.  *See, generally,* Tr. 256-261; 295-299; 368-378; 397-402.  To the contrary, and as the ALJ specifically noted, Dr. Sassoon noted on four occasions during the insured period that Claimant was alert, oriented, and pleasant, Tr. 256, 261, 374, 378, and that Claimant's medications had no side effects such as cognitive dysfunction on Claimant.  Tr. 369; Tr. 17.

Likewise, Dr. Kass described Claimant's cognitive functioning as "WNL" (within normal limits) every time he saw Claimant during the relevant time period.  Tr. 295, 296, 298, 299, 397-402. Significantly, he noted no memory deficit problems, concentration impairments, or attention problems, even though Claimant, himself, complained of concentration problems.  *See id.* Additionally, although Dr. Kass made notes in his treatment records that Claimant indicated he was "unable to work," *see, e.g.*, Tr. 298, 299, Dr. Kass further specified that the reason Claimant said he could not work was "because of back pain."  Tr. 298.  Nevertheless, the ALJ still recognized that

Claimant suffered from "mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation." Tr. 17.  In view of the results of Claimant's own psychiatrist's regular mental status examinations of Claimant,[12] it is not surprising that the ALJ did not conclude that Claimant's limitations in these regards medically equaled the effects of mild mental retardation.

Similarly, and as the ALJ pointed out, Susan Diaz, D.O., in performing a consultative examination on Claimant on July 15, 2002, wrote, "Mental status: The affect is normal. . . .  The patient is oriented in all three spheres.  Memory is intact.  Calculation and cognitive functions are normal.  Abstract and executive functions are good."  Tr. 325; Tr. 18.  The psychiatric review technique used by Angela C. Register, Ph. D., on July 14, 2002, to perform a consultative Mental Residual Functional Capacity Assessment, also supports the ALJ's finding of invalidity of the IQ test.  In that technique form, Dr. Register did not base her medical disposition on mental retardation. Tr. 305.  Likewise, in the psychiatric review technique used by David L. Kirk, licensed psychologist, in conducting his consultative Mental Residual Functional Capacity Assessment on January 7, 2003,[13] Dr. Kirk declined to base his medical disposition on mental retardation.  Tr. 343.  Taking into account all of these circumstances, the Court concludes that the ALJ's determinations that the IQ test score was not valid and that Claimant does not otherwise meet or equal the criteria of Listing 12.05C

---

[12]Although Dr. Kass's August 31, 2006, Medical Assessment of Claimant indicates that Claimant had "memory and concentration problems on MSE," his treatment notes for the relevant time period, as summarized above, do not reflect such problems.  Instead, they show precisely the opposite: that Claimant's cognitive functioning fell within normal limits.  Tr. 295-299; 397-402.  This matter is addressed in more detail in Section V.B.2, *infra*.

[13]While the year indicated on the form is "2002," the record in the case clearly indicates that the examination occurred in 2003.  *See* Tr. 343; Tr. 6.

easily satisfy the requirement that they be supported by substantial evidence.

### 3. *ALJ's Discrediting of Treating Physicians' Opinions*

Next, Claimant contends that the ALJ did not demonstrate good cause for disregarding the assessments made by treating physicians Dr. Kass and Dr. Sassoon. "It is well established that 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997)). Among other good cause, a treating physician's opinion may be discounted when it is not accompanied by objective medical evidence or it is wholly conclusory. *Id.* (citing *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991)). Similarly, where a treating physician's report is contradicted by his own treatment notes, an ALJ has good cause to reject the report. *See Edwards v. Sullivan*, 937 F.2d at 584.

Here, the ALJ discounted the reports of Drs. Kass and Sassoon because he found that they were inconsistent with the doctors' treatment records and the medical evidence of record. Tr. 23. Moreover, the ALJ concluded that "the opinions of these doctors give no rationale to support their opinions. In addition, there is no clinical support for these opinions. . . . [T]here are no supporting treatment notes from Dr. Sassoon or Dr. Kass which are consistent with their opinions." *Id.*

Beginning with Dr. Kass, as discussed previously, Dr. Kass prepared two Medical Assessments of Ability to Do Work-Related Activities (Mental) of Claimant – one on May 13, 2004, and one on August 31, 2006. In the first report, despite specific instructions to "relate particular medical findings to any assessed limitation in capacity" and to identify the particular medical or clinical findings (*i.e.*, mental status examination, behavior, intelligence test results, symptoms) which

-37-

support [the] assessment of any limitations, Dr. Kass checked "poor or none" for most abilities and "fair" for the remaining abilities.  With respect to each of the specific sections where he rendered these conclusions, he added no explanation of any type, nor did he refer to any examinations, test results, or symptoms supporting these assessments.  Indeed, Dr. Kass simply checked off his naked conclusions.  At the end of the report, he added only, "Patient suffers from chronic and recurrent psychotic and depressive symptoms that adversely affect sleep, concentration, mood modulation, and social interactions.  Patient has been diagnosed as suffering from a major mood disorder and schizophrenia.  Most likely diagnosis is schizoaffective disorder.  Progress is guarded to poor." Again, however, Dr. Kass did not refer to any tests or examinations he might have performed to support such a finding.  In short, Dr. Kass's first Medical Assessment was entirely conclusory.

As for the second Medical Assessment, Dr. Kass again evaluated Claimant's abilities in various areas as "poor or none," for the most part, and "fair" for the rest.  *Id.*  While Dr. Kass added some comments after his categories of assessments this time and referred to specific symptoms such as "high anxiety, mood lability, and racing thoughts which interfere with abilities to work [with] others," Tr. 710, he also supported his conclusions by stating that Claimant exhibited "memory and concentration problems on MSE [mental status examination.]"  Tr. 711.  Yet this statement is flatly contradicted by Dr. Kass's own treatment notes of multiple MSE's during the insured period, all of which specifically describe Claimant's cognitive functioning as within normal limits.  Moreover, Dr. Kass noted no memory deficit problems, concentration impairments, or attention problems, even though Claimant, himself, complained of concentration problems.  Thus, while Dr. Kass's statements of Claimant's symptoms *as Claimant reported those symptoms to Dr. Kass* (*i.e.,* high anxiety, racing thoughts, and restlessness) are consistent with the specific symptoms Dr. Kass referred to in his

second Medical Assessment, Dr. Kass's opinions in his second Medical Assessment are inconsistent with Dr. Kass's records of his own conclusions drawn at the times that he conducted MSE's of Claimant during the insured period, when Claimant was making reports of those symptoms to Dr. Kass.[14]

Additionally, other evidence in the record does not support Dr. Kass's opinions. For example, the Medical Assessments of Drs. Register and Kirk both conflict with Dr. Kass's conclusions, as these doctors found that while Claimant experienced some limitations, he remained capable of performing at least simple work tasks. Similarly, as discussed previously, Dr. Sassoon's observations during his examinations of Claimant were also inconsistent with Dr. Kass's conclusions, as were the observations of Dr. Diaz.

The ALJ also pointed to the testimony of Dr. Griscom in the first hearing, where Dr. Griscom opined that Claimant's impairments failed to meet or equal any listing. Tr. 23. As the ALJ noted, during the first hearing, the evidence showed that Claimant had explained that his mental condition improved with medications, that he drove, that he had an ongoing relationship with a girlfriend, that he helped to put up fences, that he worked out at a gym, and that he went to the beach. *Id.* Additionally, Claimant had reported that he had worked part time while disabled. *Id.*

Finally, the ALJ pointed to Claimant's own testimony and lack of credibility as a reason to

---

[14]Dr. Kass conducted the second Medical Assessment close to three years after Claimant's insured status expired. In the meantime, Hurricane Wilma, which hit South Florida on October 24, 2005, apparently caused serious damage to Claimant's home, which, according to Claimant's testimony before the ALJ on October 10, 2006, deeply affected Claimant. To the extent that Hurricane Wilma might have contributed to Claimant's mental health status, while the Court is sympathetic to any damages Claimant may have experienced as a result of the storm, the Court may not consider any effect the storm may have had on Claimant's mental health, as it occurred more than two years after Claimant's insured status expired.

find that although Claimant suffered from some mental health problems, they were simply not consistent with the conclusions of Dr. Kass.  More specifically, the ALJ referred to the fact that Claimant conducted all activities of daily living independently, he drove, he went to the mall, he went shopping for groceries, he went to the beach, and he engaged in other activities on his own. Taking into consideration all of these factors, the Court finds that the ALJ had good cause to discount the opinion of Dr. Kass as embodied in his Medical Assessments of Claimant.

As for Dr. Sassoon's opinions, Dr. Sassoon stated in his Medical Assessment completed on May 28, 2004, that Claimant could engage in neither sedentary nor light work as a result of his back condition.  Tr. 382.  While Dr. Sassoon opined that Claimant could never climb, crouch, kneel, or crawl, he concluded that Claimant could occasionally balance and stoop. Tr. 380.  Other aspects of Dr. Sassoon's report indicated that reaching, handling, feeling, and pushing/pulling were not affected by Claimant's condition.  Tr. 380.  Dr. Sassoon further stated that Claimant could stand and/or walk for a total of two hours in an eight-hour work day and one-half of an hour without interruption.  *Id.* Dr. Sassoon also concluded that Claimant could sit for a total of two to three hours in a work day, but only one-half of an hour without interruption.  *Id.*  He further found that Claimant could carry only five pounds.  Tr. 379.  Additionally, Dr. Sassoon stated that Claimant suffered from "severe" pain and moderately severe fatigue.  Tr. 382.  Finally, Dr. Sassoon indicated that Claimant had suffered from his impairment at the level indicated to be present at the time that Dr. Sassoon prepared the Medical Assessment, since 1989.  Tr. 383.  Dr. Sassoon gave his opinions in a conclusory fashion.  *See* Tr. 379-383.

On March 17, 2005, Dr. Sassoon prepared a second Medical Assessment.  [Tr. 522].  In his second Medical Assessment, Dr. Sassoon reached nearly all of the same conclusions has he had in

his first Medical Assessment, except Dr. Sassoon (1) did not indicate that Claimant could lift or carry anything; (2) opined that Claimant could stand and/or walk for a total of one hour in an eight-hour work day and one-half of an hour without interruption; and (3) found that Claimant could sit for only two hours total in a work day and one-half of an hour without interruption. Tr. 523. In support of his findings regarding Claimant's inability to climb, crouch, kneel, and crawl, Dr. Sassoon referred to a magnetic resonance image to support his conclusions, and he referred to no tests or observations to support his conclusion regarding Claimant's alleged inability to sit. *Id.* As with the first Medical Assessment, Dr. Sassoon's Second Medical Assessment was, for the most part, conclusory. Tr. 522-526.

Dr. Sassoon made a third Medical Assessment on August 21, 2006 [Tr. 705]. In his third Medical Assessment, Dr. Sassoon stated that Claimant could lift and carry a maximum of five pounds. Tr. 705. He further concluded that Claimant could sit or stand and/or walk for no more than one hour in an eight-hour day, and that he could sit without interruption for only fifteen minutes. Tr. 706. To support this conclusion, Dr. Sassoon stated that Claimant was positive for an L45 disc protrusion. *Id.* With regard to Claimant's postural activity abilities, Dr. Sassoon opined that Claimant could never climb, stoop, crouch, kneel, or crawl, and that he could occasionally balance. *Id.* Dr. Sassoon found that Claimant's abilities to reach, handle, feel, push/pull, see, hear, and speak were not affected by Claimant's impairment. *Id.* As for Claimant's pain, Dr. Sassoon described it as "severe," and indicated that Claimant experienced moderate to severe weakness or fatigue. Tr. 707. As he had in his first and second Medical Assessments, Dr. Sassoon determined in the third Medical Assessment that Claimant could perform neither light nor sedentary work. Tr. 708. This time, however, Dr. Sassoon indicated that Claimant's impairment at the level indicated in the Third

Medical Assessment had been present for only about four years.  *Id.*

As noted above, the ALJ found Dr. Sassoon's opinions to be conclusory, unsupported by Dr. Sassoon's treatment notes, and inconsistent with the evidence of record.  Tr. 23.  This Court agrees. First, while Dr. Sassoon's treatment notes make clear that Claimant certainly experienced some impairment, those same treatment notes indicate that Claimant was able to manage that impairment within tolerable limits, enabling him to go on with his life.[15]  For example, Dr. Sassoon noted that Claimant experienced decreased range of motion, had significant tenderness upon rotation of the hips, and had multiple trigger points in his mid and lower lumbar paraspinal muscles.  Tr. 256. Additionally, Dr. Sassoon indicated that Claimant suffered from chronic sacroiliitis (Tr. 367), lumbar disc disease, and lumbar radiculitis.  Tr. 373.

Significantly, however, Dr. Sassoon also repeatedly noted that Claimant improved materially upon treatment.  More specifically, during the insured period, Dr. Sassoon variously prescribed home exercises, stretches, a physical therapeutic program, acupressure, TENS therapy, magnet therapy, Lidocaine injections, a Lidoderm patch, Flexeril, Celebrex, Zoloft, Percocet, Vicodin, Neurontin, Pamelor, and Skelaxin.  Tr. 257-60; 367-78.  According to Dr. Sassoon's treatment notes, Claimant found these treatments to be helpful and to provide "significant relief."  *See, e.g.,* Tr. 257,-59, 367-

---

[15]The Court further observes that Dr. Sassoon's Medical Assessments are inconsistent with each other.  While the first and second Medical Assessments (the later of which was prepared in March, 2006) assert that Claimant has suffered since 1989 from his condition at the levels indicated at the time of each assessment, the third Medical Assessment, which was prepared a little more than a year later, indicates that Claimant has experienced his impairments at the levels indicated in that assessment only for the last four years.  Additionally, the first, second, and third Medical Assessments rate Claimant's abilities somewhat differently.  If Claimant suffered from his condition to the same extent as it existed when the third Medical Assessment was prepared for the four years prior, the results of each Medical Assessment should have been the same.

73. Indeed, Dr. Sassoon stated that the medications "appear to help with [Claimant's] function," Tr. 259, and that the "injections and pharmacologic intervention [were] helping him perform ADL [activities of daily living] activities." Tr. 367. More particularly, Claimant, himself, reported to Dr. Sassoon that the medications decreased his pain level from a nine to a two or three out of ten and enabled Claimant to perform basic ADL's and stay independent. Tr. 368, 369, 371, 373; *see also* 376 (stating that medication decreased pain to four out of ten and enabled him to function), 377 (same). Claimant similarly advised Dr. Sassoon that Lidocaine injections were helpful and provided him with relief for three to four weeks at a time. Tr. 370, 371, 374, 376, 377, 378. Where treatment provides relief, a claimant's impairment should be evaluated, based on his ability to function as a result of treatment. *See Lucas v. Sullivan*, 918 F.2d 1567, 1572 (11th Cir. 1990).

Other medical evidence of record also supports the ALJ's discounting of Dr. Sassoon's opinions regarding Claimant's abilities to work as a result of his impairments. First, on January 28, 2002, Claimant visited Joel Fleiss, M.D. He advised Dr. Fleiss that the reason for his visit was that he was "working [at] home building [a] fence" when he began feeling pain. Tr. 284. Building a fence in 2002 is not consistent with experiencing disabling pain since 1996 that would not allow Claimant even to engage in sedentary work.

As the ALJ expressly noted, on July 15, 2002, Claimant also underwent a consultative examination by Susan Diaz, D.O. Tr. 18. At that time, Claimant advised Dr. Diaz that he was "unable to sit, stand, or walk for any length of time without having [low back pain with radiating pain down his left leg]." Tr. 323. In examining Claimant's lower lumbar spine, Dr. Diaz found it to be "mild[ly] inflam[ed]." Tr. 325. Additionally, she noted "mild-to-moderate tenderness to palpation and upon range of motion with limited range of motion." *Id.* While she determined that

-43-

the straight leg-raising test was positive on the left to approximately 30 degrees, she, nonetheless, noted that "[a]ll other joint groups and ranges of motion [were] within normal limits." *Id.* Contrary to Dr. Sassoon, who observed Claimant to walk with an antalgic gait, Dr. Diaz reported Claimant's gait to be "normal," although she noted that Claimant could not walk on heels and toes or perform a partial squat. *Id.* Based on her examination, Dr. Diaz concluded, as it pertained to Claimant's back, that Claimant had low back pain, secondary to his motor vehicle accident. Tr. 326.

Consultative Physical Residual Capacity Assessments in the record similarly conflict with Dr. Sassoon's opinions expressed in his Medical Assessment. On July 31, 2002, R. Jennifer Peckoo-Williams, M.D., prepared a consultative Physical Residual Capacity Assessment regarding Claimant. [Tr. 327]. In it, she concluded that Claimant could both stand and/or walk (with normal breaks) and sit (with normal breaks) for a total of about six hours in an eight-hour work day for each activity. *Id.* In support of her conclusions, Dr. Peckoo-Williams referred to an MRI, Claimant's vital statistics, the fact that Claimant had no muscle atrophy or deformity and only mild inflammation and mild to moderate tenderness, among other indications. *Id.*

A second Physical Residual Functional Capacity Assessment was prepared on December 12, 2002, by a different DDS physician. This doctor reached the same conclusions as Dr. Peckoo-Williams with regard to Claimant's ability to sit and stand during a work day. *See* Tr. 336. Additionally, the second Physical Residual Functional Capacity Assessment opines that medical examination results supported the position that Claimant can engage in light work. Tr. 340.

Then, on December 21, 2005, Roland D. Kaplan, D.O., conducted a consultative examination of Claimant. Tr. 458. During Claimant's examination, he complained of "ongoing pain in the lumbar left lower extremity and occasional falling and giving way and occasional[] 'trembling' of

the left leg." *Id.*  Additionally, Claimant stated that he periodically experienced "pins-and-needles" in the left lower extremity and also in the left upper extremity, and that he had neck pain on occasion.  *Id.*  Dr. Kaplan noted that Claimant advised that he was independent with "basic ADL's including showering, toileting, and getting dressed and he ambulate[d] without the use of any assistive device."  *Id.*  As a result of Dr. Kaplan's physical examination of Claimant, Dr. Kaplan found that Claimant walked with a slight limp favoring the left lower extremity, but he was able to heel-and-toe walk.  Tr. 459.  Dr. Kaplan specifically observed "a good range of motion in hips, knees, and in ankles."  *Id.*  He found that Claimant's muscle strength was grossly 5-/5 and that Claimant had "full range of motion in his shoulders, elbows, wrists, and fingers."  *Id.*  According to Dr. Kaplan's examination, Claimant's cervical spine range of motion was grossly intact, as were Claimant's lumbar spine flexion and extension and lateral flexion.  *Id.*

Dr. Kaplan also reported on test results.  With respect to x-rays of the lumbar spine, Dr. Kaplan found that they demonstrated "normal AP and lateral views with no evidence of fracture or dislocation."  Tr. 459.  Based on Claimant's "somewhat unstable gait," and not because of Claimant's strength, Dr. Kaplan opined that Claimant was limited to carrying ten pounds.  *Id.*  He further determined that standing was limited to at least two hours in an eight-hour work day, but that Claimant was not restricted in any type of seated or light-duty type of activity.  *Id.*  Specifically, Dr. Kaplan reported that Claimant had "full use of his upper extremities with no limitations there."  *Id.*  In fact, Dr. Kaplan concluded that Claimant "would be a good candidate for vocational rehabilitation."  *Id.*  The ALJ specifically referred to Dr. Kaplan's examination in his decision.  Tr. 18-19.

In addition, the ALJ relied upon his assessment of Claimant's credibility.  Tr. 21-23.  In this

regard, the ALJ indicated that he found Claimant's credibility to be wanting, even describing it at one point as "sadly lacking." Tr. 22. In reaching this conclusion, the ALJ referred specifically to the documentary evidence, as well as to the testimony.

With respect to the documentary evidence, the ALJ noted that the record reflects various inconsistencies in Claimant's statements throughout the course of his multiple quests for disability benefits. In this regard, the ALJ pointed to Claimant's conflicting reports of his educational level, discussed previously. Tr. 22. As the record reflects and Claimant does not deny, at various times, he has stated that he finished only the sixth grade, only the seventh grade, only the eighth grade, only the ninth grade, and only the tenth grade of school, that he obtained his general equivalency diploma, and that he attended vocational school for six months for mechanics and automotive repair. Tr. 22.

Additionally, other aspects of the record further suggest that Claimant is not credible in other regards. Among other notable examples, during his January 3, 2006, consultative examination with Dr. Coelho, Claimant reported that his pain was "at the top of the rating scale all of the time." Tr. 469. Yet the record reflects that during the period last insured, Claimant repeatedly advised his treating doctor, Dr. Sassoon, that lidocaine injections provided relief for three to four weeks at a time and that other treatments such as drugs, exercise, stretching, ice, and heat, also significantly relieved his pain, taking it from a nine to a two or three on a scale of ten. *See, e.g.*, Tr. 368, 369, 370, 371, 372, 374, 375.

In this same vein, it is also noteworthy that in the February 27, 1992, ALJ decision denying benefits to Claimant, who, at that time, had alleged disability due to low back pain and urinary incontinence, the ALJ, who was different from the ALJ in the pending case, expressly found, "The

claimant's allegations of pain are not credible and are not supported by the evidence of record."[16] Tr. 51.  In that case, as the ALJ in the instant case alluded to, the ALJ reported that two doctors had found inconsistencies in Claimant's gait.  Tr. 49-50.  Similarly, in the earlier case, Claimant also complained of "constant 10 out of 10 pain."  Tr. 50.

With respect to Claimant's testimony, the Court notes that as the finder of fact, the ALJ has particularly wide latitude to evaluate the credibility of the testimony.  *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984).  In this case, the ALJ found that Claimants "statements concerning the intensity, persistence and limiting effects of [Claimant's medically determinable impairments] [we]re not entirely credible."  Tr. 22.  In addition to many of the inconsistencies in the record regarding Claimant's symptoms, the ALJ cited a specific example, explaining how he reached this conclusion. In that regard, the ALJ noted that Claimant testified at the hearing that he was able to sit for only ten to fifteen minutes, but during the hearing he sat for an hour and five minutes, before "affect[ing] a gasp and moan, and start[ing] to fidget in his chair."  *Id.*

In short, a review of the record demonstrates that this Claimant has a long history of attempting to obtain disability benefits based on, among other information, claims repeatedly found to be lacking in credibility by both doctors and ALJ's alike.  Thus, in the instant case, the ALJ had good cause to discount the opinions of Dr. Sassoon, as embodied in his Medical Assessments, and the ALJ's conclusions regarding Claimant's abilities to engage in sedentary work are supported by "substantial evidence."

---

[16]In 1997, when Claimant received disability benefits, the ALJ issued his decision finding a disability without a hearing.

### VI.   CONCLUSION & RECOMMENDATION

Claimant had a fair hearing and a full administrative consideration in accordance with the applicable statutes and regulations.  Substantial evidence supports the ALJ's findings as noted in his December 26, 2006, Notice of Decision.  For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's Motion for Summary Judgment [D.E. 10] be **DENIED**, that Defendant's Motion for Summary Judgment [D.E. 16] be **GRANTED**, and that the decision of the Commissioner be **AFFIRMED**.

The parties shall have ten (10) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal the factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**ORDERED AND ADJUDGED** at Fort Lauderdale, Florida, this 12th day of September, 2008.

_____
ROBIN S. ROSENBAUM
United States Magistrate Judge


cc:     Honorable William P. Dimitrouleas
        Counsel of Record

-48-